James W. BEGLEY et al.,
Plaintiffs-Appellees,

v.

F. David MATHEWS, Secretary of
Health, Education and Welfare,
Defendant-Appellant.

No. 75–2472.

United States Court of Appeals,
Sixth Circuit.

Argued June 22, 1976.

Decided Nov. 8, 1976.

Rehearing Denied Dec. 8, 1976.

**1346**

William W. Milligan, U.S. Atty., Thomas D. Thompson, Columbus, Ohio, Rex E. Lee, William Kanter, Frederic D. Cohen, Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C., for appellant.

Irwin Barkan, Columbus, Ohio, Frank J. Neff, Columbus, Ohio, for Begley.

Frederick Oremus, Nelsonville, Ohio, for Nutter.

Paul Pachuta, Reynoldsburg, Ohio, for Spears.

Before WEICK, EDWARDS and McCREE, Circuit Judges.

EDWARDS, Circuit Judge.

The Secretary of Health, Education and Welfare appeals from an order of remand for further consideration of claims for disability benefits to three coal miners who had filed claims under the Black Lung Benefit Act of 1972, 30 U.S.C. § 901 *et seq.* (1970). The appeals require this court to interpret a regulation (20 C.F.R. § 410.490 (1975)) against the background of the Black Lung Benefits Act and the related provisions of the prior Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 801, *et seq.* (1970). With all of this statutory and regulatory language thus made available, we find none of it specifically in point. Indeed, we find ourselves again cautiously sailing the sea of congressional intent without bell or buoy.

In one portion of our ruling (affirming the District Judge's remand of these cases to the Secretary of Health, Education and Welfare for further consideration), we reject rulings on these cases made by the Secretary and his agents. We believe remedial legislation such as the Black Lung Benefits Act should be given a liberal interpretation; and moreover Congress clearly stated its desires for the Secretary to do just that in relation to this specific Act. In another phase of our ruling, we reject a broad interpretation of the statutes and regulations sought by claimants and endorsed by the District Judge because we believe it to be completely inconsistent with the structure and the purpose of the Act.

## THE FACTS

The three miners concerned are Begley, Spears and Nutter. All of them had

worked in the coal mines of the nation for more than 15 years before June 30, 1973. All of them applied for black lung benefits prior to June 30, 1973. All of them had quit work in the mines before that date. None of them succeeded in mustering evidence of total disability prior to June 30, 1973, to the satisfaction of the administrative law judges and the Appeals Council which determined the facts in these cases for the Secretary of Health, Education and Welfare. In each case the record contained a ventilatory (breathing capacity) test which showed that the claimant at a date prior to June 30, 1973, had a breathing capacity above the standard set in 20 C.F.R. § 410.490. In each case, however, the record also contained a ventilatory test which showed that on a date subsequent to June 30, 1973, each claimant had a breathing capacity below the standard set in 20 C.F.R. § 410.490. The pre-June 30, 1973 tests would serve to deny to each claimant the benefit of the presumption of total disability created by § 410.490. The post-June 30, 1973 tests would serve to qualify each claimant for the presumption. The questions we deal with [1] all concern whether and how the presumption made available to claimants by the post-June 30, 1973 tests may be applied to the facts of these cases.

## THE QUESTIONS

The two critical questions appear to us to be:

1) Do the Black Lung Benefits Act of 1972 and Regulation 410.490 read together not only require the filing of a claim prior to June 30, 1973, but also the proof of total disability occurring on or prior to June 30, 1973?

The Secretary answered "Yes." The District Judge answered the question "No." As to this question we agree with the Secretary, albeit for somewhat different reasons.

---

1. Appellees have filed a motion to dismiss this appeal, which we hereby deny. We believe that the concession made by the Secretary that he has no evidence at present to rebut the presumption of total disability established by

2) Assuming, as the Secretary has now belatedly conceded, that post-June 30, 1973 ventilatory tests may be considered as evidence which relates back to disability claimed to exist prior to or on June 30, 1973, was the District Judge correct in remanding these cases to the Secretary for further consideration of the granting of the § 410.490 presumption?

The Secretary argues that this question should be answered "No." The District Judge answered it "Yes." As to this question, we agree with the District Judge.

## TOTAL DISABILITY DUE TO PNEUMOCONIOSIS

The present black lung (pneumoconiosis) law is a combination of two statutes. The Coal Mine Health and Safety Act, Pub.L. No. 91–173, 30 U.S.C. § 801 *et seq.* (1970), was adopted in 1969. Its stated purpose included these sentences:

[C]ountless thousands [of coal miners] have suffered and died or presently suffer from the ravages of coal workers' pneumoconiosis—the dread miners disease caused by the inhalation of excessive amounts of coal dust.

It is the purpose of the bill H.R. 13950 to protect the health and safety of coal miners, and to combat the steady toll of life, limb, and lung, which terrorizes so many unfortunate families.

H.R.Rep. No. 91–563, 91st Cong., 1st Sess. (1969), U.S.Code Cong. & Ad.News, p. 2503. (Footnote omitted.)

By 1972, however, the record of the Social Security Agency of the Department of Health, Education and Welfare in processing and disposing of pneumoconiosis claims was anything but satisfactory to Congress. In passing the Black Lung Act of 1972, Congress recorded these findings and purpose:

§ 901. Congressional findings and declaration of purpose

---

20 C.F.R. § 410.490 does, as the Secretary asserts, make the District Judge's order of remand for application of that presumption a final order for purposes of appeal.

Congress finds and declares that there are a significant number of coal miners living today who are totally disabled due to pneumoconiosis arising out of employment in one or more of the Nation's coal mines; that there are a number of survivors of coal miners whose deaths were due to this disease or who were totally disabled by this disease at the time of their deaths; and that few States provide benefits for death or disability due to this disease to coal miners or their surviving dependents. It is, therefore, the purpose of this subchapter to provide benefits, in cooperation with the States, to coal miners who are totally disabled due to pneumoconiosis and to the surviving dependents of miners whose death was due to such disease or who were totally disabled by this disease at the time of their deaths; and to ensure that in the future adequate benefits are provided to coal miners and their dependents in the event of their death or total disability due to pneumoconiosis.

30 U.S.C. § 901 (Supp.1975).

The Senate Report on the bill was more explicit as to, at least, Congressional intent:

Accordingly, the Committee expects the Secretary to adopt such interim evidentiary rules and disability evaluation criteria as will permit prompt and vigorous processing of the large backlog of claims consistent with the language and intent of these amendments. Such interim rules and criteria shall give full consideration to the combined employment handicap of disease and age and provide for the adjudication of claim on the basis of medical evidence other than breathing tests when it is not feasible or practicable to provide physical performance tests of the type described in the above cited section from the Secretary's annual report. For example, an older miner who has developed pneumoconiosis, or another respiratory or pulmonary disease which is presumed to be pneumoconiosis, and who is no longer working as a miner, would be prevented from returning to or continuing in his usual work as a miner due to the combined employment handicaps of advancing age and respiratory or pulmonary disease, even though the disease may have produced relatively little functional loss.

S.Rep. No. 92-743, 92d Cong., 2d Sess. (1972), U.S.Code Cong. & Ad.News, pp. 2322-23.

Against this background, the Secretary adopted the regulation which provides the principal issue in this appeal:

§ 410.490 Interim adjudicatory rules for certain Part B claims filed by a miner before July 1, 1973, or by a survivor where the miner died before January 1, 1974.

(a) *Basis for rules.* In enacting the Black Lung Act of 1972, the Congress noted that adjudication of the large backlog of claims generated by the earlier law could not await the establishment of facilities and development of medical tests not presently available to evaluate disability due to pneumoconiosis, and that such claims must be handled under present circumstances in the light of limited medical resources and techniques. Accordingly, the Congress stated its expectancy that the Secretary would adopt such interim evidentiary rules and disability evaluation criteria as would permit prompt and vigorous processing of the large backlog of claims consistent with the language and intent of the 1972 amendments and that such rules and criteria would give full consideration to the combined employment handicap of disease and age and provide for the adjudication of claims on the basis of medical evidence other than physical performance tests when it is not feasible to provide such tests. The provisions of this section establish such interim evidentiary rules and criteria. They take full account of the congressional expectation that in many instances it is not feasible to require extensive pulmonary function testing to measure the total extent of an individual's breathing impairment, and that an impairment in the transfer of

oxygen from the lung alveoli to cellular level can exist in an individual even through his chest roentgenogram (X-ray) or ventilatory function tests are normal.

(b) *Interim presumption.* With respect to a miner who files a claim for benefits before July 1, 1973, and with respect to a survivor of a miner who dies before January 1, 1974, when such survivor timely files a claim for benefits, such miner will be presumed to be totally disabled due to pneumoconiosis or to have been totally disabled due to pneumoconiosis at the time of his death, or his death will be presumed to be due to pneumoconiosis, as the case may be, if:

(1) One of the following medical requirements is met:

(i) A chest roentgenogram (X-ray), biopsy, or autopsy establishes the existence of pneumoconiosis (see § 410.428); or

(ii) In the case of a miner employed for at least 15 years in underground or comparable coal mine employment, ventilatory studies establish the presence of a chronic respiratory or pulmonary disease (which meets the requirements for duration in § 410.412(a)(2)) as demonstrated by values which are equal to or less than the values specified in the following table:

|  | Equal to or less than— | |
| --- | --- | --- |
|  | FEV $_1$ | and MVV |
| 67″ or less | 2.3 | 92 |
| 68″ | 2.4 | 96 |
| 69″ | 2.4 | 96 |
| 70″ | 2.5 | 100 |
| 71″ | 2.6 | 104 |
| 72″ | 2.6 | 104 |
| 73″ or more; and | 2.7 | 108 |

(2) The impairment established in accordance with subparagraph (1) of this paragraph arose out of coal mine employment (see §§ 410.416 and 410.456).

(3) With respect to a miner who meets the medical requirements in subparagraph (1)(ii) of this paragraph, he will be presumed to be totally disabled due to pneumoconiosis arising out of coal mine employ-

ment, or to have been totally disabled at the time of his death due to pneumoconiosis arising out of such employment, or his death will be presumed to be due to pneumoconiosis arising out of such employment, as the case may be, if he has at least 10 years of the requisite coal mine employment.

(c) *Rebuttal of presumption.* The presumption in paragraph (b) of this section may be rebutted if:

(1) There is evidence that the individual is, in fact, doing his usual coal mine work or comparable and gainful work (see § 410.412(a)(1)), or

(2) Other evidence, including physical performance tests (where such tests are available and their administration is not contraindicated), establish that the individual is able to do his usual coal mine work or comparable and gainful work (see § 410.412(a)(1)).

(d) *Application of presumption on readjudication.* Any claim initially adjudicated under the rules in this section will, if the claim is for any reason thereafter readjudicated, be readjudicated under the same rules.

(e) *Failure of miner to qualify under presumption in paragraph (b) of this section.* Where it [i]s not established on the basis of the presumption in paragraph (b) of this section that a miner is (or was) totally disabled due to pneumoconiosis, or was totally disabled due to pneumoconiosis at the time of his death, or that his death was due to pneumoconiosis, the claimant may nevertheless establish the requisite disability or cause of death of the miner under the rules set out in §§ 410.412 to 410.462.

## APPENDIX

A miner with pneumoconiosis who meets or met one of the following sets of medical specifications, may be found to be totally disabled due to pneumoconiosis at the pertinent time, in the absence of evidence rebutting such finding:

(1) Arterial oxygen tension at rest (sitting or standing) or during exercise and

simultaneously determined arterial $p^{co}_2$ equal to, or less than, the values specified in the following table:

| Arterial $p^{co}_2$ (mm. Hg) | and | Arterial $p^{o}_2$ equal to or less than (mm. Hg) |
|---|---|---|
| 30 or below | | 65 |
| 31 | | 64 |
| 32 | | 63 |
| 33 | | 62 |
| 34 | | 61 |
| 35 | | 60 |
| 36 | | 59 |
| 37 | | 58 |
| 38 | | 57 |
| 39 | | 56 |
| 40 or above | | 55 |

(2) Cor pulmonale with right-sided congestive failure as evidenced by peripheral edema and liver enlargement, with:

(A) Right ventricular enlargement or outflow tract prominence on X-ray or fluoroscopy; or

(B) ECG showing QRS duration less than 0.12 seconds and R of 5 mm. or more in $V_1$ and R/S of 1.0 or more in $V_1$ and transition zone (decreasing R/S) left of $V_1$;

or

(3) Congestive heart failure with signs of vascular congestion such as hepatomegaly or peripheral or pulmonary edema, with:

(A) Cardio-thoracic ratio of 55 percent or greater, or equivalent enlargement of the transverse diameter of the heart, as shown on teleroentgenogram (6-foot film); or

(B) Extension of the cardiac shadow (left ventricle) to the vertebral column on lateral chest roentgenogram and total of S in $V_1$ or $V_2$ and R in $V_5$ or $V_6$ of 35 mm. or more on ECG.

20 C.F.R. § 410.490 (1975).

Appellant Secretary supplies this quick summary of his position:

In passing the Black Lung provisions of the Coal Mine Health and Safety Act, Pub.L. 91–173, Congress intended to provide benefits to the large number of coal miners who were totally disabled due to pneumoconiosis, and to the survivors of such miners. Congressional action was believed to be necessary because few states provided benefits for death or disability due to the disease. 30 U.S.C. § 901. *Collins v. Weinberger*, 401 F.Supp. 377, 379 (W.D.Va., 1975) (appeal pending). While the ultimate burden of financing Black Lung insurance programs was placed on the mine owners themselves, 30 U.S.C. § 931 *et seq.*, the financial burden of having to pay benefits to the great backlog of diseased miners and their widows was felt to be too great for private industry to bear. Congress therefore provided that the United States itself would pay benefits to this backlog of individuals. 1972 U.S.Code Cong. & Admin.News, p. 2310.

In furtherance of these objectives, Congress established two separate benefit programs. Under Part B of the Act, administered by HEW, 30 U.S.C. §§ 921–925, the United States pays benefits for life to all claimants who file their claims before June 30, 1973. 30 U.S.C. §§ 923(a) and 924(b).[5] Miners who file before this

[5] The cut-off date under the original Act was December 31, 1971. In 1972, the Act was amended to provide for the time limits described above. See Pub.Law 92–303 §§ 5(1)–5(3).

deadline are likewise entitled to take advantage of the interim presumptions of disability contained in 20 C.F.R. § 410.-490. Under Part C of the Act, administered by the Secretary of Labor, 30 U.S.C. §§ 931–941, claims after January 1, 1974 are filed pursuant to State workmen's compensation laws, where the Secretary finds that such laws provided adequate coverage. 30 U.S.C. § 931. Where State laws do not provide adequate coverage, then the mining companies themselves must pay the benefits. 30 U.S.C. § 933(a). To smooth the transition between Part B and Part C of the Act, Congress provided that the Secretary of Labor would administer all claims filed between July 1, 1973 and December 31, 1973. 30 U.S.C. § 925. Successful claims filed during this interim period would be

paid by the United States until December 31, 1973 (30 U.S.C. §§ 924(b), 925(a)(1)), after which time they would be paid by the mine owners themselves, or by the States, under qualifying workmen's compensation programs. The mine industry is bound by the Secretary of Labor's determination on claims filed during this interim period. 30 U.S.C. § 925(a)(5). As the district court observed, June 30, 1973 is the significant transition date as regards the scope of the government's liability through HEW. The United States is liable for paying all benefits arising out of claims filed before this date, and the mine owners, under Part C of the program, are responsible for financing all post-December 31, 1973 benefits arising from claims filed after that date.

It is HEW's position that to file a claim which qualifies a miner to federal benefits, a miner must not only submit his claim prior to June 30, 1973, but must also demonstrate that a factual basis exists to substantiate his claim that he was disabled as of that date.

To this the District Judge (appellees basically rely upon his opinion) responds in part as follows:

Mr. Begley, Mr. Spears and Mr. Nutter all seek to invoke an interim rebuttable presumption of total disability which is set out at 20 C.F.R. § 410.490(b) (1974). This section creates, *inter alia*, a rebuttable presumption of total disability due to pneumoconiosis if certain pulmonary function test values are less than or equal to specified values set out by the Secretary of Health, Education and Welfare pursuant to 30 U.S.C. § 921(a) and (b). The heading of § 410.490 is as follows: "Interim adjudicatory rules for miners for certain Part B claims filed by a miner before July 1, 1973 . . . ." Since the interim standards established by the Sec-

retary are considerably lower than his permanent pulmonary function standards, *cf.* 20 C.F.R. § 410.490(b) *with* 20 C.F.R. § 410.426(b), the plaintiff miners in the cases before this Court are anxious to establish their entitlement to the interim presumptions.

The Secretary of Health, Education and Welfare stated at 20 C.F.R. § 410.-490(a) that the purpose of the interim presumption was "to permit prompt and vigorous processing of the large backlog of claims" which was generated by restrictive application of the 1969 act. In promulgating such a regulation, the Secretary could have limited it in such a way that the interim standards applied only to pulmonary function test values taken on or before June 30, 1973. Or he might have provided that the standards would apply to test values taken after that date, if the values were found to relate back to that date. He did neither. The regulation by its terms applies to all claims filed by miners on or before June 30, 1973; it does not establish any date of onset of disability which must be met.

■ We agree that the Secretary's regulation (20 C.F.R. § 410.490) did not provide an answer as to the date by which disability must needs be established in order for a claimant to have the benefit of the presumption. Nor are we persuaded that a satisfactorily clear answer to the problem is provided by the filing statute and regulation, 42 U.S.C. § 423(b) (1970) and 20 C.F.R. § 410.226(b) (1975). Like the District Judge, we think the language deeming the application "effectively filed" as of the date when disability was proved may well have been responsive to the problem of continued coverage under the Act (See 42 U.S.C. § 416(i)(2) (1970)).[2]

There are, however, four significant reasons for our accepting the Secretary's view that the proof of disability must in these

---

**2.** Whatever influence the filing statute and regulation referred to above might have on the disability date question (which in any event we decide on other grounds in favor of the Secre-

tary's position), it has no effect upon the remand question which we will deal with subsequently.

cases apply to a date on or before June 30, 1973.

1. Congress employed that date as the date of limitation for filing claims before the Secretary of Health, Education and Welfare. It also provided for all subsequent claims to be determined and paid by either the Department of Labor or state workmen's compensation systems under procedures to be established by them. 30 U.S.C. §§ 925, 931 (Supp.1975).

2. Congress authorized and directed the Secretary of HEW to "make payments of benefits in respect of total disability of any miner due to pneumoconiosis . . . ." 30 U.S.C. § 921(a) (Supp.1975). Congress further authorized the Secretary "by regulation [to] prescribe standards for determining for purposes of subsection (a) of this section whether a miner is totally disabled due to pneumoconiosis . . . ." 30 U.S.C. § 921(b) (Supp.1975). It was under authorization of these two subsections that the Secretary promulgated the now disputed regulation 20 C.F.R. § 410.490 (1975). We have read the language and interrelationship of these subsections and the disputed regulation as lending strong support by implication to the Secretary's interpretation that the total disability (which is the basis for any payment of benefits under this section) must be proved to have existed within the period of the Secretary's responsibility—on or before June 30, 1973.

3. In debate on the floor of the Senate, Senator Williams, who was floor manager of the 1969 Act, said:

The Senate conferees had some degree of success in getting the House to recede from the full Federal funding and complete State exclusion from the disability benefits program. I say some degree of success. Under the House amendment the Federal Treasury would have borne the responsibility for claims filed within 7 years. Although the House would not completely accede to the Senate provision, it did agree to a program under which the Federal Government would accept the financial burden *for the 50,000 miners who have already been disabled and are no longer employed* or should be no longer forced to struggle through another day's work in mines.

Miners or widows filing claims within the first 2 years would be paid benefits by the Federal Government at an average of less than $50 a week. *For persons disabled thereafter,* the burden would fall on the State workmen's compensation program, unless the State refused to accept the responsibility. If the State chooses not to fulfill this obligation to the disabled coal miners, the employers would be required to accept the obligation in accordance with the procedures of the Longshoremen's and Harbor Worker's Compensation Act. I believe this is a fair and responsible provision. (Emphasis added.) Hearings before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare on S. 2675, S. 2289, H.R. 9212, 92d Cong., 1st and 2nd Sess. (1971–1972), at 369.

The portions of this statement which are italicized above appear to us to come closer to explaining Congressional intent as to when total disability must be established than any other expression in the legislative history.

4. Finally, of course, we have been reminded recently and emphatically that the interpretation given a statute by the federal agency charged with administering it must be given great deference.

In *Train v. Natural Resources Defense Council,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), Justice Rehnquist said for the Court:

We therefore conclude that the Agency's interpretation of §§ 110(a)(3) and 110(f) was "correct," to the extent that it can be said with complete assurance that any particular interpretation of a complex statute such as this is the "correct" one. Given this conclusion, as well as the facts that the Agency is charged with administration of the Act, and that there has undoubtedly been reliance upon its inter-

pretation by the States and other parties affected by the Act, we have no doubt whatever that its construction was sufficiently reasonable to preclude the Court of Appeals from substituting its judgment for that of the Agency.

*Train v. Natural Resources Defense Council, supra* at 87, 95 S.Ct. at 1485.

*See also Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

We note that various of the District Courts have come to the same conclusion concerning the significance of the June 30, 1973 date. *Mullins v. Weinberger,* 397 F.Supp. 17, 19 (N.D.W.Va.1975); *Collins v. Weinberger,* 401 F.Supp. 377, 381 (W.D.Va. 1975); *Greenwall v. Weinberger* (W.D.Ky., No. 75–0011–0, Oct. 6, 1975). *Cf. Brakefield v. Mathews* (N.D.Ala. No. 75–A–118–S, Dec. 5, 1975).

### THE REMAND QUESTION

█ The Secretary's argument in this appeal opens with this paragraph:

The issue in this case concerns the proper use of medical evidence supporting a claim for disability benefits due to pneumoconiosis which becomes available after June 30, 1973, but before final adjudication of the claim by HEW. It is the Secretary's position that to qualify for permanent federal coverage under the Act, the requisite disability must be shown to have existed on or before June 30, 1973, and that medical evidence accumulated subsequent to that date is relevant only insofar as it relates back to the period before July 1, 1973.

We agree.

The Secretary's brief concludes:

In the present case, therefore, since claimant did not meet the interim standards of 410.490 as of June 30, 1973, he cannot contend that he was among the backlog of disabled miners entitled to

federal benefits. Since the interim standards were designed solely to identify this discrete class of miners, there is no justification for applying those standards to his claim.

We believe this last paragraph to be a non sequitur insomuch as it is presented to argue against the District Judge's remand.

As we read this record, no effort has been made by either party to determine whether or not the post-June 30, 1973 ventilatory tests gave support not only to his total disability on that date—but also to his total disability on or before June 30, 1973. This, we believe, may well be due to the fact that the Secretary appears to have come belatedly to the position that post-June 30, 1973 tests could relate back.

In *Collins v. Weinberger,* Judge Turk, Chief Judge of the United States District Court for the Western District of Virginia, made this interesting analysis of our instant problem: [3]

In the second group of cases, where the claimants had ceased their employment prior to the cut-off date, the Secretary also denied benefits because they failed to establish total disability due to pneumoconiosis prior to July 1, 1973. But in so denying these claims, the Secretary refused to consider medical evidence showing the existence of pneumoconiosis subsequent to June 30, 1973. The Secretary concluded that medical evidence showing the disease at some time after that date was irrelevant to the determination of whether the miner had the disease as of the cut-off date.

By way of deposition, Dr. William F. Schmidt, a noted authority in the black lung field, testified that the detection of pneumoconiosis is a difficult procedure and that x-rays and other tests are subject to differing interpretations. He stated that the disease grows very slowly and furthermore, that it would be logical to assume that recent positive evidence of

**3.** We note that Judge Turk wrote at a date preceding the Secretary's concession that post-June 30, 1973 tests could relate back.

pneumoconiosis would mean that the miner has had the disease for at least two years. In short, he considers later positive evidence highly relevant to the question of whether the miner had the disease on a prior date.

Since pneumoconiosis does not just suddenly appear, but is of a slow and progressive nature, the court holds that later medical evidence is pertinent to the inquiry, and that therefore, such medical evidence may relate back to a time prior to July 1, 1973. Accordingly, the cases of the second category are remanded to the Secretary for further consideration, and it is so ordered.

*Collins v. Weinberger, supra* at 381.

█ Medical evidence of a subsequent condition of health, reasonably proximate to a preceding time may be used to establish the existence of the same condition at the preceding time. Wigmore, Evidence §§ 225, 233 (3d ed. 1940). Admission of such evidence would appear to be favored by the liberalized Rules of Evidence recently made effective. Fed.R.Evid. 702, 704 (1975).

The Black Lung Benefits Act of 1972, 30 U.S.C. § 923(b), provides in part:

In determining the validity of claims under this part, all relevant evidence shall be considered, including, where relevant, medical tests such as blood gas studies, X-ray examination, electrocardiogram, pulmonary function studies, or physical performance tests, and any medical history, evidence submitted by the claimant's physician, or his wife's affidavits, and in the case of a deceased miner, other appropriate affidavits of persons with knowledge of the miner's physical condition, and other supportive materials.

The Black Lung Benefits Act of 1972, 30 U.S.C. § 923(b) (Supp.1975).

█ As we see the matter, when a miner at a relatively short time after June 30, 1973 is found by ventilatory (or other) tests to be entitled to a presumption of disability from a disease known to be of a slowly progressive character, the possible effect of such "relevant evidence" should be carefully weighed to determine whether or not it establishes that his breathing capacity was below the standards set in 20 C.F.R. § 410.-490 on or before June 30, 1973. If so, the presumption of total disability accorded by the just cited regulation should be granted to him. It is not this court's function to speculate as to whether remand with added calculations and medical opinion concerning such "relation back" will affect the ultimate outcome of these three appeals. It was clearly the Congressional intent that all miners whose vital signs had been damaged by pneumoconiosis on or before June 30, 1973 to the degree which the Secretary saw fit to specify in 20 C.F.R. § 410.490, should be accorded a rebuttable presumption of total disability. They should have an opportunity to prove their case in this regard at a time when the guidelines are clearly recognized.

## SUMMARY

█ For recovery of black lung disability benefits a claimant must have filed his application on or before June 30, 1973, and at some time before final decision by the Secretary he must have presented proof that he was totally disabled on or before June 30, 1973. The proofs may, however, be *presented* after June 30, 1973 and may consist of examinations which were *made* after that date.

█ We deal here with a progressive disease. Thus where there were studies on or before June 30, 1973, and after June 30, 1973, and the latter studies showed marked deterioration in breathing capacity exceeding the requirements set out in 20 C.F.R. § 410.490, application of the presumption depends upon whether or not by mathematical probabilities and relevant medical opinion the minimum requirements needed for application of the presumption, as set out in 20 C.F.R. § 410.490, had been present on or before June 30, 1973.

We find no reason in this record to believe that such evidence has been sought

and presented or that such an evaluation has been made. On remand the record in the three cases may be reopened for additional testimony from both claimant and the government relevant to this issue.

The critical question in relation to this progressive, often deadly, disease is whether within the reasonable probabilities of medical science the post-June 30, 1973 test showed such progression beyond one or more of the minimal requirements for triggering the 20 C.F.R. § 410.490 presumption as to warrant a finding of fact that one or more of such requirements had been met as of June 30, 1973. If so, plainly the post-June 30, 1973 test should be read as establishing grounds for granting the presumption of total disability—subject always to the rebuttal which is provided for in the regulation.

The judgment of the District Court remanding these three cases to the Secretary of Health, Education and Welfare is affirmed in accordance with the views expressed in this opinion.